May it please the Court. My name is Eric Berry. For the plaintiffs and appellants, Michael and Norman Knopf, this is a fraudulent conveyance action, as the Court is aware. It's highly similar to the Court's seminal decision in HPE v. Frank. It mirrors that case on many, many levels. It's a case where there should be a reversal for just a few very simple reasons. First, in both our briefs, we cite a total of eight decisions which provide, which hold, that both good faith and adequacy or proportionality of exchange are required in order to show fair consideration. Here, it's admitted, it's in the record at pages 789 to 791, that Meister Seelig took this mortgage knowing that the transferor, the mortgage, the mortgagor, was violating its contractual promises that would only give a mortgage to the Knopfs. It's admitted, this is bad faith, this has been the similar cases have repeatedly addressed these issues. For example, on page 12 of our reply brief, I think we're talking about the $300,000, right? We're talking about the only about the $300,000 portion. But so doesn't that boil down to whether or not this was a flat fee or whether or not it was not a flat fee? And if it wasn't a flat fee, if it was based upon work that was going to be done and was reasonably anticipated, and, in fact, the work that was done was more than the $300,000, where is it? It is analogous and legally the equivalent of a flat fee because a mortgage lien accrues immediately and accrues in the full face value of the mortgage. The New York Court of Appeals has addressed this in State Bank v. FioVarante. The legislature has addressed this in RPA. Roberts. If they hadn't used it, was there any reason to think that if they hadn't worked up to the $300,000, is there any reason to think that the balance would not have been returned? I'm sorry. I didn't hear the last part of the question. Is there any reason to think the balance would not have been returned if they hadn't earned up to the $300,000? This is addressed. For example, if the liquidation of the debt is less than the mortgage, sure, it may come back to the transferor, but it doesn't necessarily come back to the transferor. The creditor can't force the transferor to take it back. And this is why we cite this is addressed in the Carlson treatise that we or the Carlson article, as long as the treatise, that we cite throughout our brief. He says in these circumstances, the creditor has a fraudulent conveyance claim. And that's the situation. If, for example, and to take an extreme example, a lawyer takes a million-dollar mortgage in exchange for promising to write a notice of appeal. Spends three hours, writes a notice of appeal. Obviously, the amount of securities, the amount of advances are far less than the amount of the mortgage lien that's already accrued under Fee of Verante. But the creditor can't compel the transferor to get that remaining $999,000 back. If, and that's exactly why, and this is implicit in a lot of what's held in H.B. Refrank, and it's explicit in these Carlson articles, and it's absolutely the logic behind all these cases we cite about the mortgage lien accruing in the full amount and full-face amount of the mortgage. Kagan. But your argument is, your case, is that there has been not just a conveyance, but a fraudulent conveyance, which requires an element of bad faith. So how can you have the element of bad faith necessary to underpin a fraudulent conveyance if, in the situation here, the amounts had not been spent and might never be spent? Therefore, there may have been a conveyance, but not a fraudulent conveyance. I think that's the first point. Okay. Under 272B, which expressly addresses transfers of security interest, such as this, the law, as I mentioned at the outset, is that both the fair consideration requires both that the exchange be not excessively disproportionate and that the transfer re received the conveyance in good faith. Here, the transfer re knew that the transferor was violating its contractual obligations to my clients, not to mortgage property to anybody else. So if you look at the Motorola decision at page 12 of our reply brief, this is one of many decisions we cite, knowledge of any fact sufficient to put the transfer re on inquiry notice as to the existence of some right or title in conflict. Our right to prohibit a mortgage to anyone other than Michael Knopf is a right. It's squarely within the decisions we cite. Was there a finding or a holding of a court that you had that right? The court acknowledged that we had that right. When? Before or after this transaction that you're challenging was done? The right came into existence in 2006. The transfer took place in 2015. And the notices of pendency, though, were gone before the mortgage, right? And that's – please, with respect to that issue, I'd like to refer you to pages 23 and 24 of our reply brief. This is an argument that was made below, it was made several times. It's not correct. Under the De Silva decision, if a notice of pendency is dismissed, that – De Silva actually makes this very clear. De Silva says that while we hold that the purchaser's actual knowledge of a pending appeal of the claim with support of the notice of pendency is not legally significant, nevertheless, it further states, same decision, De Silva, under well-established common law principles, a purchaser of real property is bound by the consequences of a lawsuit of which he has actual knowledge. And there have been two decisions expressly addressing this issue subsequent to De Silva and interpreting De Silva. One of them is Cerami v. Teramina, and that holds – this is exactly – this is page 24 of our reply brief. It holds that although a list pendant was not filed in subject law until after the conveyance, it is well settled that a purchaser of real property is bound by the consequences of a lawsuit of which he has actual knowledge. Sotomayor, here the list pendant was lifted before the transaction was entered into. That would seem to indicate a court's view that your claim on this property is subject to legitimate question. Three responses. The point I'm talking about now, that doesn't – that point doesn't apply where a party has actual knowledge of the claim and, Mr. Steele, get actual knowledge of our constructive trust claim. Second, wholly separate and apart from that, you don't need a list pendant to show bad faith or even a claim to show bad faith where there is an antecedent contractual right that the transferee is aware of and takes the transaction. Where is that $300,000 now? What's the status of it? Meister has collected that money. Okay. In exchange for billings at a – at its normal rate with respect to transactions that it identified as work that it was undertaking to do? The transaction went through and there's an escrow amount, right? Right. That doesn't mean that you don't assess these issues retrospectively. You assess them, and this is directly in HB v. Frank and directly in a Fourth Circuit decision we cite. You address them at the time of the transfer. Is the $300,000 in escrow or has it been paid, or both, and explain how that could be? It has been transferred along with other money. The full amount of the mortgage plus interest has been transferred to Meister Seelig in satisfaction of pursuits obligation to Meister Seelig. And it's not being held in escrow by anybody? It was in escrow for a while. It was. I'm asking you now. It's gone. I'd like to know what it is, because you've got a very tangled history. So I'd like to know, standing there right now, what's the answer to my question? I've said it before and I'll say it again. It was Meister has been paid that money. It has received it. Now, you have a you just got a judgment of $8 million against Stanford, right? Against pursuit. Against pursuit, which is Stanford's entity. It's $9.9 million if you count the interest. Okay. And this is part of an effort to collect on that judgment? This is part of an effort to collect on the claim that underlies that judgment. You do not need to be a judgment creditor in order to bring a fraudulent conveyance action. You only need to be a creditor. The definition of creditor under the DCL is extremely broad. Okay. You reserved for about a little more time. Thank you. Good morning, Your Honors. Stephen Meister, if it please the Court, for Meister Seelig. Your Honors, the arguments being made by the knobs here have been evolving. So, let me see if I could just take them in sequence very quickly. At the December conference, in this case, the pre-motion conference that the District Court held, Mr. Berry was very clear this is record A484. Our claim is based on what I told you earlier. This is a flat fee and violates the teachings of the HBE decision in the Second Circuit. Our claim is based on the legal theory that this is a flat fee given by an insolvent and, therefore, it violates HBE, the Frank, the Frank Second Circuit decision teachings. And a little bit later in that conference record at A486, Mr. Berry says, there are errors in the billing statements. They do not amount to an amount that would have an impact in a favorable way for us to show. Clearly, the amount of work done for future services exceeds 300,000. In Mr. Berry's words, we couldn't possibly contest that with good faith. So, we go through discovery. I am deposed. All the documents, including the retainer letter, the note, and the mortgage are produced, other relevant documents, and we make a summary judgment motion. Summary judgment motion argues this theory, this HBE. We say that, and this is in the record at A137, the mortgage, and A148, the note, both have the two words, up to. Up to, because the way the obligation was structured is 275,000 was for past due services, which Mr. Berry did not and still does not dispute was a valid antecedent debt. And as to the 300,000, to get to the questions of fact you were asking, Your Honor, the 300,000 had my client essentially not cheated me out of this arrangement and surreptitiously conducted the sale, Mr. Berry knew about it, I did not, the 275 would have been paid, and the 300,000 would have gone into my IOLA escrow account, and I would have rendered bills for the described services on an hourly rates, those bills had to be approved by Mr. Samford, as would disbursements from the escrow. So that didn't happen because the sale took place furtively, and I didn't. Sotomayor, but you're whole now. You've been paid. I've been paid. I've been paid. I would pick a little bit at the word whole because I was awarded significantly more in the arbitration, but I was paid. Not to mention you're here as well, but that's another. Not to mention I have probably $400,000 a time in this case, which was not in that award, but I had... What happened to the rest of the money? I mean, this penthouse wasn't sold for $575,000. No, sir. It was sold for approximately $3 million. I don't know what happened to the money. I didn't get it. What happened, so you're clear, Your Honor, is when it sold in, I think, February of 2016, without my knowledge, Mr. Samford was able to get a title company to take an escrow of $650,000 and omit my mortgage as an exception in the title policy, essentially insuring over my mortgage. The buyer and the buyer's mortgage company, if he had one, then closed title. I subsequently learned, however I learned, I don't even recall any longer, about the sale, and Mr. Berry had threatened the title company with legal repercussions, but eventually what happened, as you know, is, you know, the lease pendants were all canceled, and if I may, I'm moving back... Mr. Berry says the lease pendants may have been canceled, but you knew that there was an undertaking not to mortgage that property. So that's what I was about to get to. In the first instance, and in the first instance, the lease pendants were canceled, there were two, one for another property and one for this property, because the courts of New York had assessed that there was not a valid claim against the property. The courts of New York, the trial court and the appellate division had assessed... Isn't that odd, because the Knops are the ones who came up with the money to buy the property. They lent money to Samford to buy the property, as I understand it. They did lend money to buy the property, but the appellate division of New York determined that what the Knops had was a claim for nonpayment of a loan, that that was redressable by money damages, and that money damages were adequate as... It was not secured by the property. And were not secured by the property. Now, I will tell you, and it is interesting perhaps, maybe not so much, but the ant... What he calls... What Mr. Berry calls the anti-hypothecation covenant in a two... One of five hotly disputed 2006 documents between the Knops and Mr. Samford was never asserted as his theory for the lease pendants claim. The lease pendants claim was the imposition of a constructive trust, which was based on an alleged promise that Mr. Samford was the nominee holding title to this apartment for the benefit. He never said that he owned it, Samford owned it, and promised not to encumber it. So he never asserted... There were many different things said in these five agreements. There were many things that were not the subject of any claims. And there were some provisions that were the subject of claims. So this goes now to this bad faith element. So what he's done is, he started this case saying, I got a flat fee, it was disproportionate to the work, and therefore under HBE is a fraudulent conveyance. The evidence completely shattered that theory. And then he changed his theory, pivoted, and said, ah, but maybe even if that's true, and it was all refundable, et cetera, Mr. Meister and Meister Selig had bad faith because they knew about this anti-hypothecation covenant. I would say two things, maybe three. One is, the definition of bad faith for purposes of the New York Uniform Fraudulent Conveyances Act, is not... It's an act of participation in the fraud, like the Sardis case, where the son knew about an elaborate asset planning scheme and got an apartment for a dollar. It would not be bad faith, even if I knew about a disputed contractual provision, especially in the face of a cancellation of the list pendants, which is essentially a court's decision that there isn't a claim against the property, and then he's relegated to a money damages claim. A preference, a debtor's decision to prefer one creditor over another, with knowledge of the creditor that's preferred, is not bad faith for purposes of the Uniform Fraudulent Conveyances Act. The law is very clear on that. So there was no bad faith, and in any event, the money, you know, if Mr. Sanford had honored his agreement with me, instead of arbitrating with me and filing a fraudulent bankruptcy petition to frustrate it afterwards... Let's not introduce that. Okay. We have enough here. Yes, you do. More than enough. I'm sorry. What I'm saying is that if that had happened and the $300,000 had been in my escrow and I stopped rendering services or Sanford didn't approve a bill, he would have been in great shape. He would have sought a restraining notice of some sort against my escrow. I wouldn't have distributed the money in the face of a restraint. So I don't understand this argument that it's a present lien. It's up to, the bills have to be approved. There's been an admission by Mr. Berry for the NOPS that I rendered more than $300,000 in services. There's been a finding by an arbitrator that I rendered way more than that in services. So I just don't see there's any viable claim for fraudulent conveyance here, and I think the decision should be affirmed. Thank you. Very briefly, with respect to whether the NOPS still have a claim for constructive trust, which is a claim to impose a title or a claim to impose an equitable mortgage, here's what Judge Cote herself said. Moreover, the NOPS claim for constructive trust is still pending in the State court action. There has been no ruling on the merits. Here's what the arbitrator in Mr. Meisner's argument said. Yeah, but the lease pendants was lifted. There may not be a final judgment. But, again, that is not a safe harbor for — it's not a safe harbor for everybody. If the claim underlying the lease pendants is dismissed and the lease pendants falls, then somebody who just knows about the appeal comes into it new and learns about that, is not bound by the knowledge of the appeal. But De Silva itself, Seramino, and I think it was Sleepy Hollow that I referred to, all carve out an exception for people with actual knowledge of underlying claims. Lease pendants is constructive notice. This is actual notice. Again, I don't need to repeat the section of the — of the De Silva case that I just spoke about when I said this is analogous to a flat fee. Well, I don't think we should be bound by comments that I make when I don't even know what the motion is going to be. But in any event, here's what the legislature says. Here's what the New York legislature says. It says in RPL 281-2 that any credit line mortgage may and when so expressed therein shall secure not only the original indebtedness, but also the indebtedness created by future advances thereunder, whether such advances are obligatory or made at the option of the lender or otherwise, to the same extent and with the same priority of lien as if such future advances had been made at the time the mortgage was recorded. That means that for a $575,000 mortgage, and identically, the fee of Vervante is an up-to-whatever-the-number-was-there, up-to case, the stated amount that is the amount of the lien, the amount of the transfer, the amount of the security interest. DCL Section 272 addresses — specifically addresses security interest. It's not the value of the anticipated services or advances. It's the impairment, the amount of the lien that was imposed by the — by — that's the judgment of the legislature and that's the judgment of the court of appeals. Contrary to UCC liens, to which the parties can agree to whatever they want to agree, the mortgage lien impairs the asset in the full face value. So — Sotomayor, thank you. Thank you very much. Thank you both. We have your arguments in the briefs.